UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CONSTANTINOS STAVRIDIS,          )

    Plaintiff,                  )

vs.                              )    Civil Action No. CV96-S-1129-S

ENERGY ABSORPTION SYSTEMS, INC.,)

    Defendant.                  )

**ENTERED**

JUL 1 7 1997

## MEMORANDUM OPINION

This action is before the court on defendant's motion for summary judgment and motion to strike portions of plaintiff's evidentiary submission.  Plaintiff Constantinos Stavridis, a native of Greece, asserts that defendant Energy Absorption Systems, Inc. ("EASI") discriminated and retaliated against him because of his national origin in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et *seq.*  Plaintiff further asserts discrimination claims under 42 U.S.C § 1981.  Upon consideration of the motions, pleadings, briefs, and evidentiary submissions, this court determines that defendant's motion to strike is due to be granted, and that defendant's motion for summary judgment is due to be granted in part but also denied in part.

## I.  MOTION TO STRIKE

After plaintiff submitted evidence in opposition to EASI's motion for summary judgment, EASI filed a "Motion to Strike Portion of Respondent's Evidentiary Submission."  This uncontested motion sought to strike testimony by the plaintiff as hearsay, because it

24

concerned alleged statements made by another EASI employee, Roger Reynolds.

Plaintiff received two written warnings for safety violations, and was suspended under EASI's disciplinary policy. In deposition, plaintiff attempted to establish that other EASI employees also received two written warnings for conduct violations, but were not suspended. Plaintiff testified that Roger Reynolds told him that he had received written warnings for failure to wear safety shoes and for failure to wear a respirator, but no suspension. (Plaintiff's deposition, at 168-69.)

Clearly, statements attributed to Reynolds are offered to prove the truth of the matter asserted — that Reynolds received two written warnings, but no suspension. Consequently, plaintiff's testimony will be considered inadmissable hearsay unless it can be deemed non-hearsay under Rule 801 of the Federal Rules of Evidence, or unless it fits within an exception to the hearsay rule under Rules 803 or 804.

The court cannot ascertain an exception under Rule 803 or Rule 804 which is applicable to the statements in question. In fact, the only possible way to admit the statements in question is under Rule 801(d)(2)(D), which says that a statement is "not hearsay" if offered against a party, and, it is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. It is undisputed that Reynolds was a servant of EASI, and that the proffered statements were allegedly made during his employment with

2

EASI.  Therefore, the statements will be admissible against EASI if
they were made within the scope of Reynolds' agency or employment.

> Rule 801(d)(2)(D) requires the proffering party to lay a
> foundation to show that an otherwise excludible statement
> relates to a matter within the scope of the agent's
> employment.

*Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565 (11th
Cir. 1991)(citations omitted).

EASI contends that Reynolds' alleged statements cannot be
admissions under Rule 801(d)(2)(D), because Reynolds has not been
identified as a member of EASI's management.  While EASI's argument
is a mischaracterization of the law, the court nevertheless agrees
that the statements are not admissible.

> Nothing in Rule 801(d)(2)(D) prevents out-of-court
> statements of low-level employees from coming into
> evidence as non-hearsay admissions of a party-opponent in
> appropriate factual scenarios. . . .[T]he inquiry is
> whether [the employee] was authorized to act for his
> principal . . . concerning the matter about which he
> allegedly spoke.

*Wilkinson*, 920 F.2d at 1566.  Thus, the burden is on plaintiff to
lay a foundation for the admissibility of Reynolds' alleged
statements.  Even if Reynolds was a low-level employee of EASI,
plaintiff still might secure the admission of his statements if
plaintiff demonstrates that Reynolds was authorized to act by EASI
concerning the issuance of written warnings and suspensions.  There
is no evidence that Reynolds held such authority, however.  Rather,
the evidence indicates that Reynolds was only a laborer, like
plaintiff, who was *subject* to disciplinary treatment from EASI
management.  Accordingly, EASI's motion to strike is due to be

3

granted, and the alleged statements of Roger Reynolds will not be considered in deciding EASI's motion for summary judgment.

## II. STATEMENT OF FACTS

EASI designs, manufactures, and markets energy absorbing highway crash cushions (and similar products for the protection of motorists and highway maintenance workers). (Declaration of Janis Jones, ¶ 3.) Plaintiff is a native of Greece. He was hired in 1992 at EASI's facility in Pell City, Alabama as an "assembly laborer." (Declaration of Janis Jones; Jerry Bean Deposition 71-73.) He was the only employee of Greek national origin. His duties included manufacturing, assembling, and painting highway crash cushion products. (Janis Jones Deposition, Exhibit 6.)

## A. Plaintiff's complaints and alleged harassment from co-workers

Plaintiff first complained of unwelcome behavior by another assembly laborer, Jeff Lloyd, in 1993. On approximately twenty occasions, Lloyd allegedly threw washers at plaintiff, turned off lights in rooms where plaintiff was painting or washing parts, and substituted water in the lines of plaintiff's paint gun. (Plaintiff's Deposition, at 66-69, 101-03.) Plaintiff alleges that he consistently complained about Lloyd's harassment for a period of two years. (Plaintiff's Deposition, at 101.) EASI's Assembly Foreman, Jerry Bean, investigated the complaints, but found no corroborating witnesses and took no action. (Bean Deposition, at 29-34.) At some point, Lloyd allegedly apologized to plaintiff, but nevertheless resumed his unwelcome shenanigans thereafter. (Plaintiff's Deposition, at 85-86.)

4

On February 15, 1995, plaintiff submitted a letter to Richard McGauran, EASI's Vice President for Manufacturing, stating that Lloyd and another assembly laborer, Dwight Madden, would turn off his paint gun and his paint lights. (Plaintiff's Deposition, 84-85; Jones Deposition Exhibit 10.) The letter also alleged that Madden threatened him: "I'll fuck you up!"   (Jones Deposition, Exhibit 10.) In deposition, plaintiff testified that Madden and Lloyd also called him names, such as "mother fucker" and "son of a bitch." (Plaintiff's Deposition, at 175.)  Plaintiff's wife called EASI's Administrative Support Manager, Janice Jones, on February 16, 1995, and verbally reiterated her husband's written complaints.   (Jones Deposition, Exhibit 9.)

Plaintiff's February 15, 1995 letter to McGauran also alleged that he had complained to Jerry Bean, but that Bean simply told him to keep away from Madden.   (Jones Deposition, Exhibit 10.)   Bean testified that plaintiff made frequent complaints, but that he always investigated each one.   (Bean Deposition, at 57, 76-77.) Bean made at least three memoranda of conversations with plaintiff or other EASI employees concerning the complaints.

A handwritten memorandum dated February 17, 1995 details a discussion between plaintiff and Bean concerning plaintiff's complaints about gestures made by other employees. (Bean Deposition, Exhibit 30.)   That memorandum records that plaintiff felt "abused" by other EASI employees, including Bean.

A second memorandum of the same date indicates that Bean confronted Madden and Lloyd, and instructed them to make no gestures

5

at other employees; but Bean also concluded that plaintiff had an
"underlying problem away from his place of employment," and that no
one at EASI had done anything to warrant his complaints. (Bean
Deposition, Exhibit 29.)

Bean's third handwritten memorandum is dated April 25, 1995.
(Bean Deposition, Exhibit 32.)  On that date, plaintiff complained
that other employees were sitting on completed cartridges during a
break period.  Bean recorded his opinion that plaintiff was "just
looking for something to complain about," and that he was "just
trying to cause hate and discomfort between himself and other
employees." *Id.*

Plaintiff made other complaints.  For example, he complained
that Dwight Madden failed to hang pieces for him to paint.
(Plaintiff's deposition, at 170-72.)  Plaintiff's February 15, 1995
letter also alleges Madden and Lloyd: (1) quit work after Jerry Bean
left early on February 13, 1995; (2) worked overtime without proper
supplies; (3) left a temporary employee to do their work; (4) "[got]
away without respect for their work"; and (5) caused an injury to
plaintiff's thumb by their lack of effort. (Defendant's Evidentiary
Submission, Exhibit 26.)   Finally, Jerry Bean testified that
plaintiff consistently complained of doing "all of the work [while]
nobody else did anything." (Bean Deposition, at 53.)   Bean
allegedly moved plaintiff three times to different work areas, but
plaintiff had problems with co-workers in each area. (Bean
Deposition, at 52; Defendant's Evidentiary Submission: Exhibit 43.)

6

**B.   Alleged harassment by Bean**

As Assembly Foreman, Jerry Bean was plaintiff's supervisor, and
was responsible for plaintiff's performance evaluations.   (Bean
deposition, at 9, 11.)   Plaintiff alleges Bean and other supervisors
called him "Gus," rather than his given name.   Plaintiff further
alleges Bean made the following statements: "I can't understand you.
I can't do nothing with you" (Plaintiff's Deposition, at 176); "I
fix the Gus.   I will fire him.   I will fix real good" (*id.,* at 183);
"I hope you not coming back.   I hope you stay [in Greece]." (*Id.,*
at 187.)[1]

**C.   Disciplinary actions against plaintiff**

Plaintiff alleges that he was suspended from work for rules
violations, while non-Greek employees were permitted to continue
working despite similar violations.   EASI adheres to a "progressive"
discipline policy. (Janis Jones Declaration, ¶ 11.)   Under this
policy, an employee is first verbally warned about any deviation
from acceptable behavior or performance.   *Id.*   A second offense of
the same nature within twelve months results in a written warning
being placed in the employee's personnel file.   *Id.*   Two written
warnings for any reason within a twelve-month period result in a
three-day suspension.   (Janis Jones Declaration, ¶11; Defendant's
Exhibit 8.)   Thus, an employee should receive one verbal and two
written warnings before suspension.

---

[1]This statement allegedly was made when plaintiff told Bean that he was
traveling to Greece.  (Plaintiff's Deposition, at 187).

7

Plaintiff received two verbal warnings for failure to wear a face shield while washing parts before receiving a written warning for that offense on December 16, 1993. (Plaintiff's Deposition at 56-57, 81-82; Defendant's Evidentiary Submission: Exhibit 7.)   On August 18, 1994, Bean issued a written warning to plaintiff for failing to wear a respirator while operating a paint spray gun. (Plaintiff's Deposition at 79; Defendant's Evidentiary Submission: Exhibit 11.)   Even though that constituted two written warnings within a twelve month period, plaintiff did not receive a three-day suspension on that occasion.[2]

Plaintiff does not dispute that he failed to wear a respirator on August 18, 1994, but alleges Jerry Bean also used a paint spray gun without a respirator, and did not receive any warnings. (Plaintiff's Deposition, at 91-92; Bean Deposition, at 26-27.) Plaintiff further alleges that his "lead person," Doyle Davis, painted without a respirator. (Plaintiff's Deposition, at 91.)

On March 9, 1995, Bean issued a written warning to plaintiff for operating a staple gun contrary to physician's restrictions and Bean's directives.  (Plaintiff's Deposition, at 153-57; Movant's Exhibit 14.)   This written warning was combined with the written warning from August 18, 1994 to give plaintiff two written warnings within twelve months.  Thus, on March 22, 1995, plaintiff received

---

[2]Defendant states no suspension was given due to an "oversight" during a transition from manual records to computers.  (Janis Jones Affidavit, at ¶ 16.)

8

a three-day suspension without pay.[3]  (Plaintiff's Deposition, at 166; Defendant's Evidentiary Submission: Exhibit 16.)

On September 7, 1995, Bean issued a written warning to plaintiff because he allegedly disrupted productivity by pretending to take pictures of work performed by other employees.  (Bean Deposition, at 58; Movant's Exhibit 31.)  Plaintiff denies taking pictures or pretending to take pictures of anyone.  (Plaintiff's Deposition, at 226-227.)  That written warning was combined with the warning of March 9, 1995 to again give plaintiff two written warnings in a twelve month period.  As a result, plaintiff received another three-day suspension.[4]  (Plaintiff's Deposition 231-32; Movant's Exhibit 34.)

Plaintiff relies upon records of numerous EASI employees who received two written warnings, but no suspensions.  EASI attempts to distinguish these employees in two ways.  First, EASI uses the testimony of Janis Jones, its Administrative Support Manager, to state that the "progressive system" was changed from a manual system to a computer system shortly before plaintiff's first suspension.  (Jones Declaration, at ¶¶ 14-16.)  Essentially, EASI claims that the system was "imperfect" before plaintiff's first suspension, that he was the first person suspended under the new computer system, and

---

[3]In response to that suspension, plaintiff filed his first EEOC charge on March 29, 1995.  (Plaintiff's Deposition, at 166-67.)

[4]In response to that suspension, plaintiff filed his second EEOC charge on September 13, 1995.  (Plaintiff's Deposition, at 232-33.)

that all employees with conduct-related warnings have been correctly suspended since the implementation of the computer system.

Even with the computer system, EASI is still faced with several employees under the computer program who received two written warnings for attendance violations, but no suspensions. EASI claims that "until recently" the attendance program was treated differently than the conduct-related "progressive" system. (Jones Declaration, at ¶¶ 12-13.) Allegedly, an employee could receive two written warnings for attendance violations, but no suspension. *Id.* Thus, EASI contends that the "progressive" system was administered in a non-discriminatory manner.

## D. Performance evaluations and termination

EASI employees receive employment evaluations after one month of employment, after three months of employment, and every six months thereafter. (Janis Jones Deposition at 50.) If an employee receives an unsatisfactory evaluation, however, then subsequent evaluations may occur more frequently than at six month intervals. (Janis Jones Deposition at 58.) EASI uses its Supervisor's Manual as a guideline for evaluations of hourly-wage employees like plaintiff. (Janis Jones Deposition, at 41.) The Supervisor's Manual provides that two consecutive, unsatisfactory evaluations are grounds for termination. (Janis Jones Deposition, Exhibit 5.)

From May 13, 1992 through January 25, 1995, plaintiff consistently received satisfactory work performance evaluations. (Bean Deposition, Exhibits 21-24, 27-28.) On August 25, 1995, Bean gave plaintiff his first unsatisfactory performance evaluation.

10

(Bean Deposition, Exhibit 34.) On October 9, 1995, plaintiff received a second unsatisfactory evaluation. (Bean Deposition, Exhibit 36.) Consequently, on October 17, 1995, Bean's supervisor, Transportation and Shipping Manager Jeff Bein, issued a memorandum to plaintiff warning that, without improvement, his job was in jeopardy. (Plaintiff's Deposition 238-39; Defendant's Evidentiary Submission: Exhibit 45.) On November 9, 1995, plaintiff received a third unsatisfactory evaluation (Defendant's Evidentiary Submission: Exhibit 46); and, on November 21, 1995, Bein issued a second memorandum warning plaintiff that his job was in jeopardy, and giving him until the end of December to "significantly improve" his performance. (Defendant's Evidentiary Submission: Exhibit 47.)

On February 5, 1996, EASI was informed that plaintiff had received his Notice of Right to Sue from the EEOC. (Plaintiff's Exhibit 4.) On February 13, 1996 plaintiff received a fourth unsatisfactory evaluation from Bean. (Bean Deposition at 64-65, Exhibit 38.) Thereafter, Jerry Bean and Jeff Bein discussed plaintiff's failure to improve his performance, and made the decision to terminate his employment. (Bean Deposition at 69-70.) On February 19, 1996, plaintiff was terminated. (Defendant's Evidentiary Submission: Exhibit 49.)

**2. Timing of EEOC charges and alleged acts of discrimination**

In part, plaintiff bases his Title VII retaliation claim on the temporal proximity between his EEOC charges and right to sue letter, and adverse actions taken against him by EASI. Plaintiff filed his first charge with the EEOC on March 29, 1995, one week after his

11

first three-day suspension. (Plaintiff's Deposition, at 166-67; Defendant's Evidentiary Submission: Exhibit 22.) His next performance evaluation occurred almost five months later on August 25, 1995, and was his first unsatisfactory evaluation. (Defendant's Evidentiary Submission: Exhibit 43.)

Plaintiff filed his second EEOC charge on September 13, 1995, five days after his second disciplinary suspension. (Plaintiff's Deposition, at 232-33; Defendant's Evidentiary Submission: Exhibit 34.) Plaintiff received his second unsatisfactory evaluation on October 9, 1995. (Defendant's Evidentiary Submission: Exhibit 44.)

Finally, on February 5, 1996, EASI was informed by the EEOC that a "right to sue" letter had been issued to plaintiff. (Plaintiff's Exhibit 4.) Plaintiff received another unsatisfactory evaluation on February 13, 1996, and was discharged on February 19, 1996. (Defendant's Evidentiary Submission: Exhibit 49.) The memorandum of discharge stated plaintiff was terminated for "below standard performance review . . . for period as described in 11/21/95 letter." (Defendant's Evidentiary Submission: Exhibit 49).

### III. PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1981.

"[P]laintiff concedes that he may not maintain his claim under 42 U.S.C. § 1981 and thus does not address the issue in this argument." (Plaintiff's Brief, at 11 n.1). Plaintiff correctly concedes this point, because § 1981 does not provide protection against discrimination based on national origin. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731,

12

735 (5th Cir. 1986).    Accordingly, such claims are due to be
dismissed.

### IV.  PLAINTIFF'S DISPARATE TREATMENT CLAIMS

Plaintiff bears the burden of proving, by a preponderance of
the evidence, that defendants intentionally discriminated against
him because of his national origin.    That can be done either by
direct or circumstantial evidence.    When plaintiff's evidence is
circumstantial in nature, as is the case here, the Supreme Court has
developed a three stage framework for focusing the inquiry.    *See*
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36
L.Ed.2d 668 (1973); *Texas Department of Community Affairs v.*
*Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d
207 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113
S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Plaintiff must first establish a *prima facie* case of
discrimination based on national origin.    If plaintiff does so, then
at the second stage of analysis the burden of production shifts to
defendant to rebut the presumption of intentional discrimination
raised by the *prima facie* showing through articulation of
legitimate, nondiscriminatory reasons for the contested employment
action.    *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.    If defendant
does so, then in the final step of the inquiry plaintiff must have
an opportunity to demonstrate that defendants' stated reasons merely
are pretexts for unlawful, discriminatory motives.    *Id.*

13

## A. Denial of promotional opportunities, job assignments, and "other terms and conditions of employment"

Plaintiff's complaint alleges that EASI "discriminated on the basis of nationality against the plaintiff with respect to discipline, discharge, promotions, job assignments and other terms, conditions and privileges of employment." (Plaintiff's Complaint, ¶ 20.) Plaintiff "submits that he does not attempt to maintain claims for promotions, job assignments, or other terms and conditions of employment (except as any such allegations are encompassed by his harassment allegation)." (Plaintiff's Brief at 11 n.1.) Plaintiff correctly concedes this point, because those claims are outside the scope of his EEOC charges. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). Accordingly, those claims are due to be dismissed.

## B. Disciplinary discrimination claims

In order to establish a *prima facie* case of discrimination in an employee discipline case,

> the plaintiff, in addition to being in a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary procedures enforced against him were more severe than those enforced against other persons who engaged in similar misconduct."

*Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

### 1. Denial of work rule violation

#### a. Plaintiff's denial of violating a work rule.

Plaintiff first attempts to establish a *prima facie* case of disciplinary discrimination by stating that he did not commit one

14

of the work rule violations with which he was charged.  He denies the September 7, 1995 allegation that he disrupted productivity by taking pictures (or pretending to take pictures) of work at EASI's plant.   In deposition, plaintiff denied owning a camera, taking pictures, or pretending to take pictures.  (Plaintiff's Deposition, at 226-27.)   That testimony presents sufficient evidence to establish plaintiff's *prima facie* case.

### b.   EASI's non-discriminatory reason

Because plaintiff has established a *prima facie* case, the burden shifts to EASI to produce a legitimate, non-discriminatory reason for issuing the warning on September 7, 1995.  *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.  EASI attempts to do so by stating that Jerry Bean received complaints from other employees that plaintiff was taking pictures, that Bean conducted an investigation, and that Bean honestly believed the charge.  An employer's honest belief that the employee committed the violation is sufficient to rebut a *prima facie* case.  *Jones v. Gerwins*, 874 F.2d at 1540.

### c.   Evidence of Pretext

Bean's deposition does not support defendant's argument, however.  Rather, Bean testified that he "couldn't substantiate that [plaintiff] was or was not" taking pictures.  (Bean Deposition, at 60.)  He, therefore, issued a warning for "pretending" to take pictures.   *Id.*   That raises genuine issues of material fact regarding Bean's belief, and precludes summary judgment.

15

## 2. Discriminatory enforcement of disciplinary procedures

### a. Plaintiff's evidence

Plaintiff also seeks to establish a *prima facie* case of disciplinary discrimination by demonstrating that other employees engaged in similar misconduct, but were not subjected to the same discipline.   To do so, plaintiff offers two types of evidence. First, plaintiff testified that Jerry Bean and Doyle Davis also used a paint spray gun without a respirator, the violation that resulted in his August 18, 1994 warning.  (Plaintiff's Deposition, at 91-92.) Bean admits spraying without a respirator for short periods of time. (Bean Deposition, at 91.)   EASI does not dispute that Bean failed to give himself a warning.  Plaintiff thus has demonstrated that at least one employee engaged in similar misconduct, but did not receive a written warning.

Plaintiff also submits evidence related to fourteen EASI employees who received two written warnings for work rule or attendance violations, but no suspensions.  (Janis Jones Deposition, Exhibits. 20 and 4.)[5]   EASI does not dispute the information contained in those records.  Therefore, plaintiff has established a *prima facie* case of disciplinary discrimination.

---

[5] **Exhibit 20:** Jeffrey S. Hughes; Anthony S. Malone; Deborah J. Castleberry; Robert T. Hosmer.  **Exhibit 4:** Timothy W. Haffron; Jerry W. Dulaney; Lawrence D. Jenkins, Jr.; Ronald M. Lawyer; Terell D. Lewis; Sheldon G. Mahar; Roger A. Stewart; Jeffery O. Williams; Rick C. Goodwin; Donald L. Young.

16

### b. EASI's non-discriminatory reason, and evidence of pretext.

EASI's only non-discriminatory reason for Bean's failure to issue himself a warning for not wearing a respirator is that Bean only painted for short periods of time, while plaintiff was required to paint for extended periods. Bean further testified that he was not exposed to spray on the occasions he painted. (Bean Deposition at 26-27.) However, EASI presented no evidence of company rules forgiving Bean's failure to use a respirator. Therefore, there is sufficient evidence to withstand EASI's motion for summary judgment.

EASI's non-discriminatory reason for plaintiff's suspension essentially boils down to the use of a computer system. In its brief, EASI attempts to persuade this court that all suspensions are automatically determined by a computer system that was installed in 1994. According to EASI, after the system came on line, all employees who received two conduct related warnings were suspended.[6] EASI acknowledges that some employees could have received attendance warnings under the computer system without suspensions.[7] EASI attempts to explain this discrepancy by stating that, "until recently," attendance warnings were administered differently than conduct-related warnings. (Jones Declaration, ¶

---

[6]Of course, plaintiff received a second written warning within a twelve month period on August 18, 1994, but did not receive a suspension. EASI attributes this failure to suspend to a probable "oversight" during the transition from manual records to computers. (Janis Jones Deposition, at ¶ 16.)

[7]See (Janis Jones Deposition, Exhibit 20): Anthony S. Malone (violations on 2/9/94 & 7/18/94); Deborah J. Castleberry (violations on 12/5/95 and 4/30/96); Robert T. Hosmer (violations on 10/25/94 and 11/26/94.)

17

12.) However, EASI fails to state the "recent" date on which the policy was changed, and baselessly attempts to argue that the new attendance program began in 1995. (Letter of Defendant's counsel, dated April 22, 1997.)

In fact, EASI's entire explanation fails because of one employee. Deborah J. Castleberry received written warnings for attendance violations on December 5, 1995 and on April 30, 1996, but she was not suspended. (Janis Jones Deposition, Exhibit 20, pg 10.) Castleberry's first warning occurred late enough in 1995 that, even crediting EASI's explanation, she should have come within the "new" attendance program. Yet, the supposedly foolproof computer system still failed to indicate that Castleberry should receive a suspension.

The system actually does not determine the issuance of suspensions. Instead, it merely is an electronic system for holding data, and human management retains responsibility for deciding the merit of suspensions. Janis Jones, Administrative Support Manager for EASI's plant, stated that she enters warnings into the computer system, which informs her if the employee in question has another written warning. (Jones Deposition, at 28.) She then refers to EASI's Vice President for Manufacturing to determine if a suspension should be given. (Jones Deposition, at 27-28.) Furthermore, Jones indicated that she still uses the employee's personnel file as a basis for determining the number of written warnings issued. *Id.*

Jones' testimony, combined with the failure to suspend Castleberry, casts considerable doubt upon EASI's asserted reasons

18

for suspending plaintiff. Plaintiff relies upon Jones' testimony and Castleberry's records to assert that EASI's asserted reasons are pretextual. The court therefore finds sufficient evidence of pretext to withstand EASI's motion for summary judgment.

## C. Discharge discrimination claims

### 1. *Prima facie* case

In order to establish a *prima facie* case of discrimination in discharge, plaintiff must prove: (1) he is a member of a protected class; (2) he was qualified for the job from which he was discharged; (3) he was discharged; and (4) he was replaced by someone outside of the protected class. *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir. 1982); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991).

Defendant asserts that plaintiff cannot prove he was qualified for the job from which he was discharged, because he received poor performance evaluations. As noted by EASI, poor performance evaluations can be relevant at the *prima facie* stage. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 n.3 (11th Cir. 1992). Even so, qualification for a job position may be established by evidence that plaintiff performed his responsibilities for several years without complaint. *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520 (11th Cir. 1990). Plaintiff presented evidence that he received satisfactory performance evaluations for a period of over two years. (Bean deposition, Exhibits 21-24, 27-28.) Thus, he has fulfilled the first element of his *prima facie* case.

19

EASI further alleges plaintiff cannot prove he was replaced by someone outside the protected class. In support of this argument, EASI states that there is "no evidence that he was replaced at all." (Defendant's brief, p. 8.)   However,   Jerry Bean testified that other employees filled in for plaintiff after his termination, that other persons have been hired to fill EASI's needs, and that all of the new employees are American. (Bean deposition at 71-73.)   This testimony is sufficient to fulfill the fourth element of plaintiff's *prima facie* case.

    **2.   Non-discriminatory reasons, and pretext.**

EASI asserts that it discharged plaintiff for receiving four consecutive unsatisfactory performance evaluations. Each evaluation was given to plaintiff by Jerry Bean, however, and plaintiff testified that Bean made the following statements to him: "I can't understand you.   I can't do nothing with you" (Plaintiff's Deposition, at 177); "I fix the Gus.  I will fire him.  I will fix real good" (*id.*, at 183); "I hope you not coming back.  I hope you stay [in Greece]." (*Id.*, at 187.)

Those statements are evidence that the real reason for plaintiff's termination was not poor performance evaluations. "[O]nce a plaintiff has established a prima facie case and has put on sufficient evidence to allow a fact finder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997).

20

Accordingly, EASI's motion for summary judgment is due to be denied as to that claim.

## D.   Hostile work environment claim

To prove a *prima facie* case of hostile working environment, plaintiff must show: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based upon the his national origin; (4) the harassment complained of affected a "term, condition, or privilege" of employment, in that it was "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment"; and (5) the employer either knew, or should have known of the harassment, but failed to take prompt remedial action and, therefore, is liable under principles of *respondeat superior. Boutros v. Canton Regional Transit Authority,* 997 F.2d 198, 203 (6th Cir. 1993); *see also Henson v. City of Dundee,* 682 F.2d 897, 903-05 (11th Cir. 1987).

There is no dispute that plaintiff's Greek national origin places him in a protected class.   When viewed in a light most favorable to plaintiff, there also are sufficient facts to find that he was subjected to unwelcome harassment.   Yet, plaintiff cannot show that the alleged harassment was based on his national origin, or that it was sufficiently severe and pervasive to alter his employment.

### 1.   Harassment based on national origin

Plaintiff's primary complaints of harassment relate to actions of coworkers, such as throwing washers, turning off his paint gun,

21

turning off his paint lights, and using vulgar language. His EEOC charges also indicate that he believed Jerry Bean's written warnings, poor performance evaluations, and suspensions constituted harassment. However, none of those alleged acts of harassment contain any reference to plaintiff's national origin, or any perceived characteristic associated with his national origin. Rather, they appear to be the result of personality conflicts between plaintiff and coworkers caused by plaintiff's numerous on-the-job complaints.[8] Personality conflicts are insufficient to impose liability under Title VII. *Walker v. Nationsbank of Florida N.A.*, 53 F.3d 1548, 1558 (11th Cir. 1995).

The only instances of alleged harassment which can possibly be tied to plaintiff's nationality are statements supposedly made by Jerry Bean which were first revealed in plaintiff's deposition. Allegedly, Bean made the statements: "I hope you stay [in Greece]"; and, "I can't understand you. I can't do nothing with you." While these statements can be related to plaintiff's national origin, they still are not the type of statements which prove harassment based on national origin. *See Amirmokri v. Baltimore Gas & Electric Company*, 60 F.3d 1126, 1130 (4th Cir. 1995)(Arabian plaintiff called the "local terrorist" and "camel jockey"); *Boutros v. Canton Regional Transit Authority*, 997 F.2d 198 (6th Cir. 1993)("rich Arab" and

---

[8]As noted in the statement of facts, plaintiff made complaints about alleged harassment, but he also made numerous complaints about the quality of work performed by others at EASI. Those work-related complaints, combined with the lack of evidence pointing to national origin as the basis for harassment, indicate that there were personality conflicts between plaintiff and his coworkers.

22

"camel jockey"); *Pacanza v. Shell Oil Company,* 1997 WL 227980 at *11 (insulting plaintiff's intelligence insufficient to show discrimination based on national origin).

> ### 2. Harassment affecting a term or condition of employment

Even if the court assumes that Bean's statements demonstrate an animus toward plaintiff's national origin, plaintiff still cannot show that they were sufficiently severe or pervasive to alter the conditions of his employment and create an abusive environment. *Sparks v. Freight Carriers, Inc.,* 830 F.2d 1554, 1557 (11th Cir. 1987).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Harris v. Forklift Systems Inc.,* 510 U.S. 17 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). In evaluating whether harassment is sufficiently severe or pervasive to bring it within Title VII's purview, courts must examine the totality of circumstances, including: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. After careful consideration of the entire record, this court concludes that the conduct of which plaintiff complains is neither sufficiently severe

23

nor pervasive to create an environment that a reasonable person would find hostile or abusive.

As noted above, the only alleged harassment directed towards plaintiff and possibly based upon national origin consists of two statements: "I hope you stay [in Greece]"; and, "I can't understand you. I can't do nothing with you." Under the standards set forth in *Harris*, those statements cannot be characterized as severe or pervasive. *See Valdez v. Mercy Hospital*, 961 F.2d 1401, 1402-03 (8th Cir. 1992)(personality conflicts combined with ethnic jokes and "Mexican Sex Manual" not severe or pervasive); *Chua v. St. Paul Federal Bank for Savings,* 1996 WL 312079 at *4-5 (N.D. Ill. 1996)(not severe or pervasive where plaintiff was called "gook," dialect mocked as "slime language," supervisor stated "you Chinese, Filipino--ber, ber, ber [mocking dialect]"); *Morales v. Human Rights Division*, 878 F.Supp. 653 (S.D.N.Y. 1995)(not severe or pervasive when plaintiff called "Armando's Hispanic Princess" and asked "why persons of Hispanic descent underdress their children in the winter"); *Kaplan v. Banque Nationale de Paris*, 1995 WL 753900 at * 6 (S.D.N.Y. 1995)(four anti-semitic remarks over a four month period were isolated offensive utterances which could not form basis for harassment claim). Because plaintiff has failed to prove the fourth element of a *prima facie* case of hostile work environment, summary judgment is appropriate.

## VII. PLAINTIFF'S RETALIATION CLAIM

The familiar burden-shifting scheme developed by the Supreme Court for disparate treatment claims under Title VII applies equally

24

well to Title VII retaliation claims. *See Donnellon v. Fruehauf Corporation*, 794 F.2d 598, 600, *reh'g denied*, 800 F.2d 267 (11th Cir. 1986). Thus, a plaintiff must first establish a *prima facie* case by showing: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

## A. Plaintiff's statutorily protected expressions

Section 704(a) of Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this [title], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]." 42 U.S.C. § 2000e-3(a). Those two clauses of Section 704(a) are respectively known as the "opposition" clause and the "participation" clause.

Plaintiff's three EEOC charges clearly constitute protected expressions under the "participation" clause. *See, e.g., Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1120, 1138 (5th Cir. 1981). Plaintiff also argues that his workplace complaints were statutorily protected expressions, which this court will treat as an attempt at protection under the "opposition" clause.

In order to establish a *prima facie* case under the "opposition" clause, plaintiff must show that he had a good faith, reasonable belief that the employer was engaged in unlawful employment

25

practices. *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997).

> It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented.

*Id.* Plaintiff may have had a good faith belief that his workplace complaints related to unlawful employment practices, but the facts and record present no objectively reasonable basis to conclude that the conduct of his coworkers was based upon plaintiff's national origin.

Plaintiff complained in 1993 about washers being thrown at him by Jeff Lloyd. On February 15, 1995, Plaintiff complained that Lloyd and Jeff Madden would turn off his paint gun and his paint lights. He further alleged that Madden and Lloyd used vulgar language towards him. On February 17, 1995, plaintiff complained about gestures made by Madden and Lloyd. Finally, plaintiff complained on April 25, 1995 about employees sitting on completed cartridges during breaks.

None of those complaints can be objectively related to plaintiff's national origin. There simply are no references to plaintiff's Greek heritage, or to any perceived characteristics of persons of Greek ancestry. Without any objective references to his national origin, plaintiff's claims under the "opposition" clause must fail. Therefore, this court will continue its analysis only by reference to plaintiff's EEOC charges.

26

**B.    Adverse employment actions**

Plaintiff argues that he suffered two adverse employment actions. To begin with, he alleges that his first unsatisfactory performance evaluation was directly related to the filing of his initial EEOC charge.    Second, he alleges that his discharge was directly related to his receipt of a "right to sue" letter from the EEOC.

Poor performance evaluations, alone, rarely constitute "adverse employment actions." *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir. 1996). Furthermore, "adverse employment actions" must be such that they rise to the level of "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensating. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997). Where poor performance evaluations directly result in a loss of job or pay, however, they can rise to the proper level of adversity.    See *Gustovich v. AT & T Communications Inc.*, 972 F.2d 845, 847 (7th Cir. 1992); *Smart*, 89 F.3d at 442.

There is no dispute that plaintiff's performance evaluations directly resulted in the loss of his job.    Thus, plaintiff's performance evaluations, as well as his discharge, will be considered "adverse employment actions."

**C.    Causal relation**

To establish a causal relation between protected activities and adverse employment actions, plaintiff must merely show "the protected activity and the adverse action were not wholly

27

unrelated." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)(citations omitted). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Id.* (citations omitted). Furthermore, a short period of time between the filing of an EEOC complaint and an adverse employment action can be sufficient to establish the element of causation. *See Donellon v. Fruehauf Corporation*, 794 F.2d 598, 601 (11th Cir. 1986).

Jerry Bean testified that he was informed of plaintiff's first EEOC charge when EASI's "front office" received it. (Bean Deposition, at 42.) Plaintiff received his first unsatisfactory evaluation during the first review period thereafter.

Also, plaintiff was discharged within two weeks of receiving his right to sue letter. Bean's knowledge of the complaints, his participation in the decision to terminate, and the temporal proximity between the EEOC complaints and alleged retaliation are sufficient to establish a *prima facie* case of retaliation. *See Donnellon*, 794 F.2d at 600-01 (one month delay between complaint and discharge sufficient to establish causal connection).

## D. EASI's reason for termination and plaintiff's showing of pretext

EASI contends that plaintiff was discharged for his failure to improve his performance, as required by the November 31, 1995 memorandum. In *Swanson v. General Services Administration*, 110 F.3d 1180 (5th Cir. 1997), the Fifth Circuit held that a defendant must

28

explain both the discharge and the timing of the discharge, where timing is the basis for proving the "causation" element of retaliation. 110 F.3d at 1188. This court is persuaded that opinion will be followed by this Circuit. EASI terminated the plaintiff on February 19, 1996 for poor performance evaluations given the previous year. EASI must explain why it waited two months to fire plaintiff before its nondiscriminatory reason is accepted by this court. Consequently, summary judgment is inappropriate.

### VI. CONCLUSION

For the foregoing reasons, the court concludes defendant's motion to strike is due to be granted, and defendant's motion for summary judgment is due to be granted in part, but denied in part. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 17th day of July, 1997.

United States District Judge

29